## EXERCISE OF MUNICIPAL POWER FOR THE PURPOSE OF EFFECTING BY INDIRECTION A PURPOSE DIFFERENT FROM THAT EXPRESSED.

### Superior Court of Cincinnati.

DAVID L. CARPENTER V. THE CINCINNATI TRACTION CO. AND THE
CINCINNATI STREET RAILWAY CO.; AND DAVID L.
CARPENTER, A TAX-PAYER, V. THE CITY OF
CINCINNATI, THE CINCINNATI TRACTION
CO. AND THE CINCINNATI STREET
RAILWAY CO.

### Decided, May 7, 1912.

*Municipal Corporations—Circumstances under which Courts of Equity May Interfere with Administrative Municipal Government—Motives of Council Immaterial—Exercise of Power for a Purpose Different from that Expressed—Nullifying the Statutory Restrictions as to Granting Street Railway Franchises—Bartering Away Police Power—Seeking to Prevent Future Legislation Affecting the Public Safety and Well-being—Evidence—Burden of Proof.*

1. Courts of equity will not interfere with municipal corporations in their internal police and administrative government, unless they are transcending their powers, or some clear right has been withheld or wrong perpetrated or threatened, which must be proved by the petitioner by a preponderance of issuable facts, upon which the court can base its judgment, irrespective of the motives of members of council.

2. A municipal council possesses only such powers as are delegated to it by the state, which powers must be exercised in good faith for the accomplishment of the object for which the power is delegated, and not colorably for such a purpose in order to accomplish another object for which the power is denied to it by the state.

3. Ordinances passed by council, ostensibly in the exercise of a power to change the names of streets, but really for the purpose of nullifying the law of the state, forbidding the grant of a railway franchise unless certain conditions are complied with, are invalid.

4. An ordinance, granting a street railway franchise, bartering away the state's police power, as well as the right of future councils to legislate upon topics relating to the safety and well-being of the public, is invalid.

*Frederick Hertenstein* and *Dinsmore & Shohl,* for plaintiffs.
*Alfred Bettman,* City Solicitor, for the City.

*Joseph Wilby* and *George H. Warrington,* for the street rail-
way company and the traction company.

SPIEGEL, J.

These two cases were tried jointly to the court, and from the
evidence submitted on the trial the following state of facts has
developed: The plaintiffs in case No. 55091 are owners of
property abutting on Reading road, between Clinton Springs
avenue and Paddack road. During the summer of 1911, the
inhabitants of Bond Hill located at the end of Paddack road,
and recently annexed to Cincinnati, resumed their endeavors to
to obtain street car service to Cincinnati, organizing a Bond
Hill Welfare Association for that purpose. The latter com-
municated with the traction company, which declared its will-
ingness to extend its Avondale line by single track to a point
just south of the crossings of the N. & W. and B. & O. Railway,
but not to Bond Hill proper, provided the Bond Hill Welfare
Association would secure the necessary consents for the construc-
tion of said extension, as well as secure the passage of the
necessary ordinances granting this extension, with the proviso,
that the traction company should be exempt from the payment
of any part of the cost whatsoever for the elimination of the
grade crossings referred to, or any expense whatsoever for the
privilege of operating over the roadway, either over or under
the railroads. The traction company stated very frankly to the
Bond Hill Welfare Association that it had not been desirous of
extending its line to Bond Hill, because investigations made
showed no possible adequate return from the construction of an
extension, and the cost of building a double track extension pre-
cluded any possibility of netting an adequate return on the in-
vestment.

At a mass meeting of the Welfare Association of Bond Hill,
held September 8th, 1911, this proposal of the traction company
was unanimously adopted. In accordance with Section 9105 of
the General Code of Ohio, prohibiting council from granting a
street railway franchise until there was produced to it the

written consent of the owners of more than one-half of the feet front abutting on each street, along which it was proposed to construct a railway or an extension thereof, the members of the Bond Hill Welfare Association endeavored to obtain the signatures necessary in order to enable the council to act. They obtained the almost unanimous consent of property owners on Paddack road, but the property holders on Reading road refused to give their consent to have an extension built on said road. Public meetings were held in Bond Hill, and at one of these meetings at which several councilmen were present, among whom was Mr. Michael Mullen, the floor leader of council, the plan was evolved to change the name of the entire Paddack road to Reading road, and a small stretch of Reading road beyond Paddack road to Reading boulevard, whereby the majority of consents of abutting property holders on this new street called Reading road could be secured and the opposition of the property holders on Reading road proper would thus be overcome. Mr. Mullen frankly testified that he suggested this plan to the mass meeting, as he as well as council were anxious to give Bond Hill street railway communication with Cincinnati. Mr. Mullen further testified that Mr. Withrow, Chairman of the Bond Hill Welfare Association, presented these ordinances changing the names to the proper council committee, which reported the ordinances favorably to council, and which passed them without any hearing in council in respect to these changes of names. Similarly the ordinance granting the street railroad franchise was recommended favorably by the proper committee to council, the majority of written consents of property owners on the old Paddack road changed to Reading road greatly outnumbering the dissents on Reading road proper, these consents having been re-signed after the passage of the ordinances changing names.

Against this action of council the first suit, No. 55091, was brought on November 22d, 1911, by the abutting property owners on the Reading road in Avondale, who are named in said action, and which suit is against the Cincinnati Street Railway Company and the Cincinnati Traction Company. The second suit was filed later by Mr. David L. Carpenter, on behalf of the city of Cincinnati, as a tax-payer, against the city of Cincinnati

and the two street railroad companies named. In both actions the plaintiffs pray that the ordinances changing the names of streets as well as the ordinance granting the street railroad franchise be declared invalid, and that the defendants be enjoined from constructing said street railroad extension and further carrying out the said contract between the city of Cincinnati and the said street railroad companies, and for such further relief as may be proper.

The first question which presents itself to the court, under the pleadings and the evidence is, what right has a judicial tribunal to review the determination of a municipal council expressed by the adoption of an ordinance?

The rule is expressed by Judge Dillon in his work on "Municipal Corporations" (Vol. 1, Sec. 243), in the closing sentence of the section:

"And generally the judicial tribunals will not interfere with municipal corporations in their internal police and administrative government, unless they are transcending their powers, or some clear right has been withheld or wrong perpetrated or threatened."

And the rule of legal determination to be applied is thus tersely stated by the same author (Vol. 1, Sec. 239):

"The extent of the powers of municipalities whether express, implied or indispensible is one of construction. And here the fundamental and universal rule, which is as reasonable as it is necessary is, that while the construction is to be just, seeking first of all for the legislative intent, in order to give it fair effect, yet any ambiguity or fair, reasonable, substantial doubt as to the extent of the power is to be determined in favor of the state or general public and against the state's grantee."

And here may be added the rule laid down by Mr. Brice in Greene's Brice's Ultra Vires (page 371):

"Powers conferred upon corporations for the attainments of certain objects must be employed by them strictly and solely with reference to those objects only."

It is well settled that the judicial branch of the government can not institute an inquiry into the motives of the legislative

department in the enactment of laws, and in analogy to this rule it is true that courts will not in general inquire into the motives of a council in passing ordinances, but this rule has been qualified both by text-writers and the Supreme Courts of our states in this, that the acts of council may be impeached when the private property rights of a person or any civil right which is guaranteed by statute will be affected by the enforcement of the ordinance, and as the party aggrieved has no other adequate remedy for prevention of irreparable injury the courts sustain the right to relief by injunction. (Dillon's Municipal Corporations, Vol. 1, Sec. 650.)

In our state the same rule has been adopted. Our Supreme Court, in the case of *State* v. *The Ironton Gas Company* (37 O. S., page 45), has declared the rule to be as follows:

Syllabus 3. "The presumption is in favor of the good faith and validity of the action of the city council in passing such ordinance, and this presumption may only be overcome by the averment of issuable facts showing the contrary. It is only when the facts show, not a real but a mere colorable exercise of the authority vested in the council, that the ordinances can be held invalid."

Syllabus 4. "In the absence of facts showing fraud or bad faith on the part of the council, the inadequacy of the price of gas as fixed by the ordinance is not the subject of inquiry."

In accordance with the rule thus laid down by our Supreme Court, it will be the duty of this court to determine from the facts submitted by evidence whether the action of council in this instance was an exercise in good faith of its power to change the name of streets, or a colorable exercise of this power with reference to another object than the changing of street names.

A municipality can only exercise those powers which are delegated to it by the sovereign power of the state, and these powers thus delegated must be strictly construed.

Section 9105 of the General Code of Ohio limits the power of municipal councils to grant street railway franchises as follows:

"No such grant shall be made until there is produced to council, or the commissioners, as the case may be, the written consent of the owners of more than one-half of the feet front of the lots

and lands abutting on the street or public way, along which it is proposed to construct such railway or extension thereof; and the provisions of all ordinances of the council relating thereto have in all respects been complied with, whether the railway proposed is an extension of an old or the granting of a new route."

The power to change the name of streets in the manner in which it was done in the case before me, as shown by the evidence, is granted to municipal councils by the state in the following words:

"Section 3725.   On a petition by a person owning a lot in the corporation, praying that the name thereof be changed, the council of such municipality upon hearing, and upon being satisfied that there is good cause for such change of name; that it will not be detrimental to the general interest, and that it should be made, may declare by ordinance the name of such street changed."

The following section of the code (3726), under which, however, the action of council was not taken and could not have been taken, provides that the latter without petition may change the name of a street when there are two or more of the same names in the municipality.   Both of these sections are grants of power by the state to the municipal councils.   Both powers must be exercised in accordance with the law of the state and not in contravention thereof.   Under Section 9105 consent of a majority of the property owners on each street upon which council desires to grant a street railway franchise is a prerequisite to the power of council to grant permission to build a street railway therein; and the action of council in granting such permission is not conclusive against the property owners on the street of the fact that the requisite majority have given their assent to the construction of the street railway proposed.   (*Roberts* v. *Easton,* 19 O. S., page 78; *State* v. *Bell,* 34 O. S., page 194; *Railway* v. *Near,* 54 O. S., page 153.)

The consents of owners of lots abutting on a street to the construction and operation of a street railway on such street, are not property rights that can be appropriated under eminent domain, but are a personal right to the owner of the lot, and a power or sword in his hands with which to protect his lot against

the arbitrary powers of the city authorities. A majority of consents by the feet front is a condition precedent to jurisdiction to grant a street railway franchise, and each abutting lot owner is free to aid in conferring such jurisdiction, and free to withhold such aid. *Traction Co.* v. *Parrish,* 67 O. S., page 181.

The purpose of this statute is stated by our Supreme Court, in the case of *Roberts* v. *Eastman,* 19 O. S., page 86, as follows:

"The statute expressly prohibits the city authorities from permitting a street railroad to be constructed without such consent. It was therefore a condition precedent to the power of the city to grant the requisite permission to lay the track in controversy. The evident object of the act is to protect the owners of the property on the streets of cities therein referred to from the exercise of the arbitrary power on the part of the city authorities in permitting streets to be used for street railroads."

The power to withhold this right of abutting property owners on each street lies with the state only. In fact, prior to the passage of the statute in question, unlimited power was given to municipal councils to grant street railway franchises without the intervention of abutting property owners, and the act in question was passed to take this power from councils. The General Assembly in its wisdom might have passed an act granting the same right to the abutting property owners, but making the power of council to grant a street railway franchise dependent on the consent of a majority of feet front upon all of the streets on which the proposed extension of the street railway is to be made, instead of a majority of feet front on each single street; but the state has not seen fit to do this, and council must obey the state's mandate. It is the Legislature, not council, that can give relief, when in its wisdom, such relief is proper.

Section 3725 of the General Code, under which the state has delegated power to municipalities to change the name of streets, when two or more streets do not have the same name, permits councils to do this upon determining the following jurisdictional facts: First, that there is good cause for such change of name; second, that it will not be detrimental to the general interest, and third, that such change should be made. The evidence introduced in the case at bar shows that two petitions were sub-

mitted to council which simply prayed for the change of the name of Paddack road to Reading road, and for a change of the name of a part of Reading road to Reading boulevard, without stating any cause for the change of said names. These petitions were referred by council to its committee on street railroads. This committee in both instances reported to council that these petitions be filed and recommended to council the passage of the ordinances changing the names named without stating that there was good cause for such change of name, and that it would not be detrimental to the general interest. Council, thereupon, on the same day that these reports were submitted, passed ordinances changing the names of these streets. The record of the proceedings of council show no determination on its part that there was good cause for such change of name, and that it would not be detrimental to the general interest. As testified by Mr. Mullen, council unanimously passed the ordinances believing that good cause for such change of names existed; that in making one street out of two distinct streets it enabled Bond Hill to obtain a majority of consents of abutting property holders on this one street, although said new street visibly consists of two streets, and that this procedure would override the objection of property holders on one of these streets, namely, Reading road; believing further, that this would not be detrimental to the general interest.

Laying aside for the present the question whether council can proceed in this manner without first by a vote expressing its determination that there was good cause for such change of names, and that such change was not detrimental to the public interest, let us examine from the facts submitted in evidence, whether this action of council was a *bona fide* exercise of the power vested in it under Section 3725, or merely a colorable exercise of power under this section, in order to circumvent the inhibition of the state as expressed in Section 9105, prohibiting council from granting street railway franchises until a majority consent of the front feet is obtained from abutting property holders on each street, as said streets existed at the time when the street railway grant was sought to be given to the street railway company. It is not necessary from the evidence submitted

that the court should pass upon the motives of the members of council. The facts introduced, issuable facts as our Supreme Court calls them, makes this unnecessary. It does not even necessitate an application of the well known rule of equity that the court must look through the form for the substance, in order to do justice. The facts show that the petitioners to this change of names did not even state a cause for such change; that the committee to which these petitions were referred recommended to council that they should be filed and that the change of name should be made, and that council without passing by a vote upon the jurisdictional fact that a good cause for such change existed, and that such change would not be detrimental to the general interests, unanimously passed these ordinances for change of names; and the undisputed evidence before me. shows that these ordinances were passed because council in endeavoring to grant the franchise to the street railway company, to extend the track of the Avondale line to Bond Hill, did not have the requisite statutory number of feet front of abutting property holders, on one street, Reading road, as required by Section 9105, to grant such franchises; that this change of names of entirely different and distinct streets was made to enable council to nullify the prohibition of the General Assembly against granting such franchises until the majority of consents was obtained on each existing street. Can it be contended for one moment that the general interest thus named in the statute authorizing the change of names can mean the interest of a particular section of the city, as opposed to the general interest of all the citizens in protecting their civil rights? Surely, the general interest called for by this section does not mean a particular interest, no matter how worthy, as compared to the general interest in the enforcement of all the laws by which council is governed, and from which it derives its powers and which protects all abutting property holders alike.

I have already cited the well known rule stated by Mr. Brice in his work on *Ultra Vires,* that powers conferred on corporations for the attainment of certain definite objects must be employed by them strictly and solely with reference to those objects only. A change in a street name when made by council must therefore

apply only to the necessity of such change of name for street purposes. An examination of the evidence shows that there is no change in the physical condition of either street whose name is changed. All that council did was to give another street the same name as Reading road. Such change of name does not· change the physical condition of separate streets upon which the law of Ohio permits abutting property holders to guard their rights against granting street railway franchises by council in opposition to their wishes. True, this is not a right of property on the part of abutting property holders, and can not be appropriated and compensation given in proceedings in eminent domain, but it is a right granted to all abutting property holders alike, and no power is granted to council to grant a street railway franchise until the majority of abutting property holders on each physical street have expressed their approbation. The act of council in thus changing names did not change the topography of Paddack road, by changing its name to Reading road, nor the topography of Reading road by taking part of the middle out of Reading road and calling it Reading Boulevard. This action from the undisputed evidence clearly shows that the purpose of council in thus changing the names was not for any purpose connected with said streets, as streets, but for the sole purpose of evading the provisions of Section 9105, prohibiting council from granting street railway franchises until the majority consent of the property holders on each street was secured. Undoubtedly council believe that it was endeavoring to aid a good cause, namely, to obtain street railway communication for Bond Hill with the city of Cincinnati, but this object must be obtained by legal means, not by endeavoring to evade an act of the General Assembly prohibiting such action until certain conditions have been complied with. Council can not nullify such law by exercising a power colorably, granted distinctly for another purpose.

It is a well established rule of law that all legislation of our state in reference to the powers granted to muncipalitites is a connected whole, whether granting police or administrative powers to them. These statutes must therefore be construed *in pari materia.* To them must be applied the rule laid down

by our Supreme Court in the case of *The City of Cincinnati* v. *Connor* (55 O. S., page 89), as follows:

"It is an equally well established rule that the provisions of the statute are to be construed in connection with all the laws *in pari materia,* and especially with reference to the system of legislation of which they form a part, so that all the provisions may, if possible, have operation according to their plain import. It is to be presumed that a code of statutes relating to one subject was governed by one spirit and policy and intended to be consistent and harmonious in its several parts. And where a code or system of laws relating to a particular subject, a general policy is plainly declared, special provision should, when possible, be given a construction which will bring them into harmony with that policy; and it is only when, after applying these rules in the endeavor to harmonize the general and particular provisions of a statute, the repugnancy of the latter to the former is clearly manifest, that the intention of the Legislature as declared in the general language of the statute is to be superseded."

This same rule is declared by the Court of Appeals of the State of New York in the case of *Smith* v. *the People* (47 N. Y., page 530):

Syllabus. "A statute should not be so construed as to work a public mischief unless required by words of the most explicit and unequivocal import. In the construction of statutes, effect must be given to the intent of the Legislature whenever it can be discerned, though such construction seem contrary to the letter of the statute. Words absolute in themselves, and language the most broad and comprehensive may be qualified and restricted, by reference to other parts of the same statute, to other acts *in pari materia,* passed before or after, or to the existing circumstances and facts to which they relate. So also contemporaneous legislation, although not precisely *in pari materia,* may be referred to for the same purpose."

And finally among the many decisions from the Supreme Courts of our sister states, let me cite the Supreme Court of Rhode Island in the case of *State* v. *Beck* (21 R. I., page 288), as follows:

Syllabus 1. [*Construction of Statutes.*] "Statutes must be construed with reference to the whole system of which they

form a part, and statutes upon cognate subjects may be referred to, although not strictly *in pari materia.*"

Bearing these rules in mind, can there be any question that council has not the power to annul a law which prohibits it to grant a street railway franchise except under certain conditions which did not exist, by exercising a power granted to it by another statute for an entirely different purpose, namely: the changing of street names when good cause is shown, and the change is not detrimental to the general interest. This power, as shown by the evidence, was not exercised for the bona fide purpose of changing street names, but was colorably exercised by council for the purpose of enabling it to grant a street railway franchise, although the conditions did not exist under which it was authorized so to do; not for the *bona fide* purpose of changing the name of a street, predicated as the law provides upon good cause being shown, and not being detrimental to the public interest as opposed to a particular interest.

I have not inquired into the motives of the members of council. If, however, they are disclosed by the evidence submitted of issuable and probative facts, the court is acting within the rules governing a judicial review of governmental bodies, including of course municipal corporations, rules which I have stated and which are fully upheld by the United States Supreme Court in the case of *Soon Hing* v. *Crowley* (113 U. S., page 703):

Syllabus. "The court can not inquire into the motives of Legislatures in enacting laws except as they may be disclosed on the face of the acts or be inferable from their operation considered with reference to the condition of the country and the existing legislation."

Upon a careful examination of the law and the evidence in the case at bar, I can only find that the two ordinances changing the name of Paddack road to Reading road and part of Reading road to Reading boulevard were not passed as a bona fide exercise of the power given to council to change the name of streets for the general interest, but that the passage of said ordinance was a colorable attempt of council to evade the prohibition of the

statute to grant a street railway franchise when certain conditions did not exist.   The ordinances consequently are invalid.

The ruling in reference to these two ordinances applies also to the ordinances granting the right of the Cincinnati Street Railway Company and the Cincinnati Traction Company to extend the Avondale line to Bond Hill.   The change of names of the two streets being invalid, there is no majority of consents of abutting property holders on Reading road to give council jurisdiction to grant street railway franchises, but the vice is even greater in this ordinance than in the two preceding ones.   Paragraph B, Section 2 of this ordinance is as follows:

"The grantee herein shall not be required by an authority of the city of Cincinnati or of the state of Ohio or otherwise to extend such line and route beyond the northerly terminus herein fixed in any event, until after the elimination of the grade crossing of the Norfolk & Western Railway Company, and the Baltimore & Ohio Southwestern Railroad Company in said Reading road immediately north of said terminus, and furthermore, the said grantees, their successors and assigns shall be forever exempt from the payment of any part of the cost of the elimination of said grade crossings, and from any expense whatever for the privilege of operating along the roadway, either over or under said railroads, when said grade crossings are eliminated, in the event of the extension of said note beyond the terminus thereof herein fixed."

This ordinance inhibits the state of Ohio or the city of Cincinnati from ever exercising any power to compel said street railroad companies to extend its route over said railway crossings, and exempts them forever from the payment of any part of the cost of the elimination of said grade crossings, and from any expense whatever for the privilege of operating its road over or under said railroad crossings when the grade crossings have been eliminated.

Is it necessary that I should cite authority showing the fatal defect of *ultra vires* on the part of council in this provision? Section 8892 of the General Code provides for the elimination of railroad crossings and empowers councils when this is done to require street railroad companies to bear a reasonable propor-

tion of the cost thereof, not exceeding one-half of the portion payable by the municipality.

The case of *Railroad* v. *Defiance* (52 O..S., page 262), reviewed by the United States Supreme Court (167 U. S., page 88), has forever settled the rule that municipalities can no more barter away its power over its streets than its police power. Syllabus 5 of the decision of the Ohio Supreme Court (52 O. S., page 262), states the rule as follows:

5. "The powers conferred on municipal corporations with respect to opening, improving and repairing of their streets and public ways are held in trust for public purposes, and are continuing in their nature, to be exercised from time to time as the public interest may require; and they can not be granted away or relinquished on their exercise suspended or abridged, except when, and to the extent legislative authority is expressly given to do so."

And in the review of this case by the Supreme Court of the United States (167 U. S., page 797), the court says:

"Indeed the general principle that the legislative power of a city may control and improve its streets, and that such power when duly exercised by ordinances, will override any license previously given by which the control of a certain street has been surrendered to any individual or corporation is so well established both by the cases in this court and in the courts of the several states, that a reference to the leading authorities upon the subject is sufficient. Indeed the right of a city to improve its streets by regrading or otherwise is something so essential to its growth and prosperity that the common council can no more denude itself of that control than it can of its power to legislate for the health, safety and morals of its inhabitants."

In a more recent case, the United States Supreme Court, in the case of *The Northern Pacific Railway Co.* v. *Duluth* (208 U. S., page 583, decided as follows:

"The right to exercise the police power is a continuing one that can not be limited or contracted away by the state or its municipality, nor can it be destroyed by compromise, as it is immaterial upon what consideration the attempted control is based.

"The exercise of the police power in the interest of public health and safety is to be maintained unhampered by contracts

in private interests and uncompensated obedience to an ordinance passed in its exercise is not violative of property rights protected by the Federal Constitution.''.

*Held:* ''That an ordinance of a municipality of a state valid under the law ·of that state as construed by its highest court, compelling a railroad to repair a viaduct constructed after the opening of the railroad by a city in pursuance of a contract relieving the railroad for a substantial consideration from making any repairs thereon for a term of years was not void under the contract, or the due process clause of the Constitution.''

In the case at bar the ordinance does not even state a consideration for the exemption of the street railway company from its share of the expense of eliminating the railway crossing.

Counsel for the defendants contend that it is sufficient if the court passes on the other questions involved.in this case, but that Section 2*b* of the ordinance is not of the essence of the ordinance, and whether legal or not may be severed from Section 1 and Section 2 of the ordinance, and the validity of Section 2*b* determined when a future council sees fit to declare its purpose to build a viaduct. The evidence submitted, both oral and written, shows that this ordinance was the result of an agreement between the Welfare Association of Bond Hill and the Traction Company, the latter only being willing to lay a single track road to the railway crossing, and not to Bond Hill, and this only upon the grant of the exemption by the city authorities from its share of the expense necessary to eliminate the railway crossing when made, and that council adopted this ordinance in this manner.

To test this provision of the ordinance, a separate suit was brought by Mr. Carpenter as a tax-payer under the provision of Sections 4311 and 4314 of the General Code, which provides that the City Solicitor shall apply in the name of the corporation for an injunction to restrain the abuse of corporate power or the execution or performance of any contract made in behalf of the corporation in contravention of any law, and when the solicitor refuses to do so, that a tax-payer may bring such suit. The solicitor refused and Mr. Carpenter brought the suit. Such suit must be brought within one year after council has acted. All the counsel in the case at bar joined in the following entry in this court:

"By consent of all the parties herein named in open court, it is hereby ordered that this case be heard with cause No. 55091 in this court, wherein David L. Carpenter et al are the plaintiffs, and the Cincinnati Traction Company et al are the defendants; that the evidence heard herein shall apply to both causes and that at the determination of said causes in this court, a bill of exceptions in one of said causes shall be deemed and considered a bill of exceptions in both of said causes and may be marked with the number and style of both causes."

The tax-payer's suit is, therefore, before me for determination, a duty which this court must perform.

The claim is also advanced that if Section 2b of this ordinance is illegal, it may be separated from the entire ordinance, and the latter still upheld, but in the case of *Wellston* v. *Morgan* (50 O. S., page 147), our Supreme Court considered a case in which the council of Wellston purported to make a contract granting the giving of exclusive rights, and stipulating for lighting streets for 99 years. The court decided that the ordinance was wholly void. The question was raised as to whether only the excess of over ten years might not be lopped off, but at page 156, the court said:

"It is suggested, however, that the ordinance was not absolutely void, but may be treated as good for the term of ten years, since the subject-matter is not *ultra vires,* and inasmuch as 99 years is greater than ten years, must include it, and hence, the contract in that way may be supported. This implies that the purpose of the law is only to prevent the enforcement of contracts made in violation of its terms, and not to prevent the making of such contracts. The language of the statute is that the municipalities referred to shall have power to contract for light for any term not exceding ten years. This implies, with as much force as if it had been expressly stated, that the municipality shall not have power to contract for any term longer than ten years, and the natural inference is, we think, that the purpose is to inhibit such contracts entirely, for the only certain way of insuring their non-enforcement is to prevent their attempted execution. This may not be effectually accomplished unless they are held to be void; and this is in accord with the general rule which is well expressed by Professor Freeman, in his note to *Robinson* v. *Mayor* (34 American Decisions, page 625), as it (the municipal corporation) is per-

mitted to exercise the powers which its charter authorizes, so it is prohibted from exercising those which are not authorized. Any act or attempted exercise of power which transcends the limits expressed or necessarily inferred from the language of the instrument by which its powers are conferred is beyond the authority of a municipal corporation, and is therefore null and void.''

In concluding this branch of the case let me cite the case of *Gas Light & Coke Co.* v. *Columbus* (50 O. S., page 65), reiterating the rule that council has no power to grant any rights whereby it would hamper and embarrass future councils in the exercise of legislative powers.

Syllabus 1. ''The power to grade and improve streets is conferred upon municipal authorities for the public benefit. It is a continuing power, and is not exhausted by the first exercise of it; nor can it in the absence of statutory authority be ceded or bargained away; nor can one council by its exercise abridge the capacity of its successors to perform their duty in that behalf, as the public interest may demand.''

And on pages 68 and 69 the court says:

''The council is to perform the duty, and it is elementary, we suppose, that the council can not, in the exercise of legislative powers bind its successors unless authority from the state to do so is clearly indicated. The corporation can not abridge its own legislative power.

''It would follow from this that in prescribing regulations or annexing conditions by the city to the exercise by a gas company of a right in a street to enjoy the same for this secondary use, the council has not the authority to cede away nor bargain away the right of the city to perform its public duties, especially as to a primary use of its streets, nor to abridge the capacity of its successors to discharge those duties, unless some express provisions of statute is found to that effect, and that is not claimed.''

And, finally, let me ask since when can a municipal council barter away the police power of a state, when even the state can not do so?

Having thus applied the law to the facts as they appear from the evidence, the court finds that the ordinance changing the

name of Paddack road to Reading road, and part of Reading road to Reading boulevard are invalid, as well as the ordinance granting a franchise to the Cincinnati Street Railway Company and the Cincinnati Traction Company to continue its Avondale line to a point south of the N. & W. and B. & O. Railway crossings, and that plaintiffs in both suits are entitled to a permanent restraining order prohibiting the defendants from constructing such extension of street railway line in front of their property on Reading road, and such permanent restraining order is herewith granted.